# Exhibit C

# Jefferson Med. Surgery, P.C. v. United Healthcare Ins. Co.

United States District Court for the Eastern District of New York

September 17, 2026, Decided; September 17, 2026, Filed

26-cv-01798 (NJC) (JMW)

**Reporter**

2026 U.S. Dist. LEXIS 211493 *; 2026 LX 518172

JEFFERSON MEDICAL SURGERY, P.C., Plaintiff, -against- UNITED HEALTHCARE INSURANCE COMPANY, Defendant.

**Counsel:** [*1] For Plaintiff: Eric Schmidt, John Paul Stadler, Gottlieb and Greenspan, Fair Lawn, NJ.

For Defendant: Ethan M. Scapellati, Stradley Ronon Stevens & Young, LLP, Philadelphia, PA.

**Judges:** JAMES M. WICKS, United States Magistrate Judge.

**Opinion by:** JAMES M. WICKS

## Opinion

**REPORT AND RECOMMENDATION**

**WICKS**, Magistrate Judge:

The question presented here is when an out-of-network health care provider renders patient services and later seeks reimbursement from the patient's healthcare plan in accordance with the No Suprises Act ("NSA"), may the healthcare provider assert common-law claims for reimbursement when the healthcare plan refuses to pay amounts owed as determined by an independent dispute resolution ("IDR") under the NSA?

Plaintiff Jefferson Medical Surgery, P.C. ("Jefferson" or "Plaintiff") commenced this action against United Healthcare Insurance Company ("UHIC" or "Defendant") following UHIC's alleged refusal to pay amounts owed to Plaintiff pursuant to an IDR under the NSA. Plaintiff asserts no claim or cause of action under the NSA itself. Rather, upon UHIC's refusal to pay as determined by the IDR, Plaintiff asserts state-law causes of action: (1) breach of express contract; (2) breach of implied covenant of good faith and fair dealing; (3) declaratory judgment; (4) account stated; [*2] (5) quantum meruit; (6) promissory estoppel; and (7) unjust enrichment.[1] (*See generally* ECF No. 1-1.)

Presently before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 18.) Two questions are presented: (1) whether the NSA effectively bars Plaintiff's state-law claims; and (2) if the claims are not barred, whether Plaintiff has adequately stated claims under those state-law theories.

For the reasons stated below, it is respectfully recommended that Defendant's motion to dismiss (ECF No. 18) be **GRANTED**.

**PROCEDURAL BACKGROUND**

Plaintiff filed this action on February 16, 2026 in the Supreme Court of the State of New York, County of Suffolk, under Index No. 604573/2026. (*See generally* ECF No. 1-1.) Defendant's registered agent was served a Summons and Complaint on February 24, 2026. (ECF No. 1 at 1; Exhibit B-Affidavit of Service.) Defendant removed the case to the United States District Court for the Eastern District of New York on March 26, 2026. (ECF No. 1.)

Following the adoption of a Rule 26(f) Scheduling Order (*see* ECF No. 16), on application of the parties (*see* ECF No. 17 at 1) the Court granted a stay in part while directing the parties to proceed with "limited discovery, *i.e.*, [*3] production(s) of the administrative record pertaining to the health care claims and independent dispute resolution awards at issue in this lawsuit." (Electronic Order dated 05/29/2026) (quoting ECF No. 17 at 1).

**LEGAL STANDARD UNDER RULE 12(B)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a

[1] The latter three claims are all pleaded in the alternative.

complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also* CompassCare v. Hochul, 125 F.4th 49, 56-57 (2d Cir. 2025) (quoting Krys v. Pigott, 749 F.3d 117, 128 (2d Cir. 2014) ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.")).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Annabi v. New York Univ., No. 24-CV-2601 (LJL), 2025 U.S. App. LEXIS 8324, 2025 WL 1066083, at *1 (2d Cir. Apr. 9, 2025) (quoting Iqbal, 556 U.S. at 678). To that end, complaints are properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." Twombly, 550 U.S. at 558. When considering a motion to dismiss under 12(b)(6), the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of [*4] the plaintiff." Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012). However, this tenet does not apply to legal conclusions or "threadbare recitals of a cause of action's elements." Iqbal, 556 U.S. at 663. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. More is required. Put differently, "while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions. ... Factual allegations must be enough to raise a right to relief above the speculative level. To survive dismissal, a complaint must provide enough facts to state a claim to relief that is plausible on its face." Go New York Tours Inc. v. Gray Line New York Tours, Inc., No. 24-CV-2392 (ER), 2025 U.S. App. LEXIS 7090, 2025 WL 947083, at *2 (2d Cir. Mar. 27, 2025) (quoting Mayor & City Council of Baltimore v. Citigroup, Inc., 709 F.3d 129, 135 (2d Cir. 2013)).

**DISCUSSION**

"On December 27, 2020, Congress passed the No Surprises Act to address the issue of patients facing unexpected—and often exceedingly large—medical bills after they received treatment from out-of-network providers." Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs., 145 F.4th 212, 219 (2d Cir. 2025). "The Act prohibits out-of-network health care providers from billing healthcare plan members directly for certain items or services." *Id.* (internal citation omitted). "A provider must instead seek compensation from the patient's healthcare [*5] plan." *Id.* (internal citation omitted). "Upon receiving a request for payment from a provider, the patient's health care plan determines whether and in what amount it will pay for the services." *Id.* (citation modified; internal citation omitted). "If the provider and healthcare plan cannot agree on a reimbursement amount, the Act provides for an IDR process in which a private third-party arbitrator selects between amounts submitted by the parties." *Id.* (citation modified; internal citation omitted). The IDR decision is generally "binding on the parties . . . and is subject to limited judicial review under the Federal Arbitration Act." *Id.* (citing 42 U.S.C. § 300gg-111). "A health care plan must pay any additional compensation ordered by the IDR entity to the provider within 30 days of the decision." *Id.* (citation modified; internal citation omitted).

Plaintiff is an out-of-network healthcare provider, who provided treatment to members of health plans administered by UHIC. (ECF No. 1-1, ¶¶ 10-13.) Plaintiff and UHIC could not agree on payment, so together they initiated the IDR process, amounts were awarded and thereafter UHIC failed to pay the amounts.[2] (*Id.* at ¶¶

[2] At oral argument, defense counsel represented that the reason Defendant has not yet paid the IDR amount is that Defendant is still in the process of appealing internally to the Centers for Medicare & Medicaid Services. This representation is found nowhere in the papers. Even if it were, "a district court errs when it considers affidavits and exhibits submitted by defendants or relies on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss." Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000); *cf.* Env't Servs., Inc. v. Recycle Green Servs., Inc., 7 F. Supp. 3d 260, 270 (E.D.N.Y. 2014) (listing exceptions, none of which applies here). Defense counsel also represented that typically, when United refuses to pay an IDR award, it is because the claim was ineligible for IDR in the first place. Counsel may have been referring to Defendant's Exhibit A, a newspaper article which states as follows: "Many claims that shouldn't be eligible for arbitration, such as those for patients covered through the government programs Medicare

14-76.) This suit followed. As noted above, Plaintiff specifically [*6] does *not* assert any cause of action under the NSA itself, presumably because, as will be discussed below, most courts have concluded that the NSA does not provide a private cause of action. Instead, Plaintiff proceeds under various state-law theories such as breach of contract and unjust enrichment. (*Id.* at ¶¶ 77-141.)

Defendant moves to dismiss on the theory that the NSA preempts all state-law remedies and, even if it does not, the Complaint fails to state a claim under any of the state-law causes of action it pleads. (ECF No. 18.)

## I. Whether Plaintiff's State-Law Claims are Preempted by the NSA

At the outset, an important distinction must be noted. The parties spill much ink arguing whether the NSA provides a private cause of action. Strictly speaking, that is not the immediate question here, as Plaintiff does not purport to assert a claim under the NSA; Plaintiff asserts only state-law causes of action. That said, the question of whether the NSA provides a private cause of action turns out to be inextricably intertwined with a question that is directly dispositive here: whether the NSA *preempts* Plaintiff's state-law claims.

### *A. Whether the NSA Provides a Private Cause of Action*

Where, [*7] as here, a statute is silent as to whether it provides a private right of action, "[t]he judicial task is to interpret the statute . . . to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval, 532 U.S. 275, 286, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)* (internal citation omitted). "Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id. at 286-87* (internal citations omitted). To discern whether Congress intended to create a private remedy, courts "look first to the text and structure of the statute." *Republic of Iraq v. ABB AG, 768 F.3d 145, 170 (2d Cir. 2014)* (internal citation omitted). Among other things, courts should "consider whether the statute's methods of enforcement 'manifest an intent to create a private remedy,' as opposed to 'empowering agencies to enforce their regulations.'" *Murphy Med. Assocs., LLC v. Yale Univ., 120 F.4th 1107, 1112 (2d Cir. 2024)* (quoting *Sandoval, 532 U.S. at 289*) (citation modified). Finally, the Second Circuit has cautioned that "the Supreme Court has come to view the implication of private remedies in regulatory statutes with increasing disfavor." *Republic of Iraq, 768 F.3d at 170* (quoting *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613, 618 (2d Cir. 2002)*).

This Court concludes—as have the vast majority of courts to consider the issue — that the NSA [*8] does not provide a private cause of action. *See, e.g., E. Coast Advanced Plastic Surgery, LLC v. CIGNA Health & Life Ins. Co., No. 25 CIV. 1686 (PAE), 2025 U.S. Dist. LEXIS 157911, 2025 WL 2371537, at *17 (S.D.N.Y. Aug. 14, 2025)*, *appeal pending* Case No. 25-2204 (2d Cir.). This is because the NSA provides its own internal mechanism of enforcement. If an insurer refuses to comply with an IDR determination, the Department of Health and Human Services ("HHS") can fine the insurer $100 per day. *See 42 U.S.C. § 300gg-22(b)(2)*. "[T]he 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 328, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015)* (quoting *Sandoval, 532 U.S. at 290*). Accordingly, by providing that HHS can punish recalcitrant employers, Congress manifested an intent to preclude other remedies, namely, private causes of action.

That conclusion fits comfortably among the majority. Members of this camp include the Fifth Circuit Court of Appeals—the only circuit court to have weighed in so far—as well as Judge Hector Gonzalez of the Eastern District of New York, Judges Cathy Seibel and Paul A. Engelmayer of the Southern District of New York, the District of Delaware, the District of New Jersey, the Northern District of Oklahoma, the Northern District of Illinois, and more. *Guardian Flight, L.L.C. v. Health Care Serv. Corp., 140 F.4th 271 (5th Cir. 2025)* ("*Guardian Flight Fifth Circuit*"), *cert. denied*, *146 S. Ct. 1493, 223 L. Ed. 2d 509 (2026)*; *Jeffrey Farkas, M.D., LLC v. Horizon Blue Cross Blue Shield of New Jersey, 790 F. Supp. 3d 129, 137 (E.D.N.Y. 2025)*; *T.V. Seshan M.D.,*

---

and Medicaid, move through the system anyway. The claim from the New Jersey anesthesiologist involved a patient on a UnitedHealthcare Medicare Advantage plan, according to a lawsuit that UnitedHealth has filed protesting the arbitration decision." (ECF No. 18-3 at 3.) The Court did not consider this on the motion to dismiss in reaching its conclusions.

P.C. v. Blue Cross Blue Shield Ass'n, No. 25-CV-1255 (CS), 2025 U.S. Dist. LEXIS 252293, 2025 WL 3496382, at *9 (S.D.N.Y. Dec. 5, 2025); E. Coast Advanced, 2025 U.S. Dist. LEXIS 157911, 2025 WL 2371537, at *17; SpecialtyCare Inc. v. Meritain Health, Inc., No. CV 25-198-MN, 2026 U.S. Dist. LEXIS 26722, 2026 WL 353259, at *4 (D. Del. Feb. 9, 2026), *report and recommendation adopted*, No. CV 25-198 (MN), 2026 WL 745341 (D. Del. Mar. 17, 2026); Mod. Orthopaedics of NJ v. Premera Blue Cross, No. 2:25-CV-01087 (BRM) (JSA), 2025 U.S. Dist. LEXIS 215824, 2025 WL 3063648, at *13-14 (D.N.J. Nov. 3, 2025); Advanced Monitoring Servs. Holdings, LLC v. Blue Cross Blue Shield of Okla., No. 25-CV-466-SEH-JFJ, 2026 U.S. Dist. LEXIS 132155, 2026 WL 1725894, at *9 (N.D. Okla. May 14, 2026), *report and recommendation [*9] adopted*, No. 25-CV-00466-SEH-JFJ, 2026 U.S. Dist. LEXIS 132156, 2026 WL 1726336 (N.D. Okla. June 2, 2026); *PHI Health, LLC v. Health Care Serv. Corp.*, No. 25 C 12406, 2026 WL 1802985, at *3 (N.D. Ill. June 23, 2026).

Only two courts have concluded otherwise, that is, that the NSA does provide a private cause of action: the District of Connecticut and the District of Maryland. Guardian Flight LLC v. Aetna Life Ins. Co., 789 F. Supp. 3d 214, 229 (D. Conn. 2025) ("*Guardian Flight D. Conn.*"); PHI Health, LLC v. Optimum Choice, Inc., No. 25-cv-2320, 826 F.Supp.3d 654, 2026 WL 850453, at *9-11 (D. Md. Mar. 27, 2026). Both cases are distinguishable.

This very question is pending before the Second Circuit. In *E. Coast Advanced Plastic Surgery*, a healthcare provider sought declaratory judgment under the NSA to enforce an IDR determination. 2025 U.S. Dist. LEXIS 157911, 2025 WL 2371537, at *17. Concluding that the NSA does not provide a private cause of action, Judge Engelmayer of the Southern District dismissed the claim. 2025 U.S. Dist. LEXIS 157911, [WL] at *18. The healthcare provider appealed; the appeal is fully briefed and was argued on June 17, 2026.

The debate tends to revolve around two points. First, the NSA provides that an IDR award "shall not be subject to judicial review" except in certain circumstances. 29 U.S.C. § 1185e(b)(5)(E). Judge Engelmayer and others have interpreted this to mean that courts cannot enforce IDR awards. E. Coast Advanced Plastic Surgery,, 2025 U.S. Dist. LEXIS 157911, 2025 WL 2371537, at *17. Although judicial "review" normally implies reversal—in which case the bar on judicial review would not preclude judicial enforcement—the Fifth Circuit noted that judicial "review" can also sometimes mean enforcement. *Guardian Flight Fifth Circuit, 140 F.4th at 275* ("Providers counter that they seek only judicial *enforcement [*10]* of an IDR award, not judicial *review* of one. That is a distinction without a difference. The term 'judicial review' is broad enough to include a court's order to enforce an IDR award.") (emphasis in original). On the other hand, the courts in the Districts of Connecticut and Maryland countered that the Fifth Circuit's reading of the statute is "absurd" in context, resulting in a "non-sequitur." Guardian Flight D. Conn., 789 F. Supp. 3d at 228; *PHI Health, 826 F. Supp. 3d at 665-66*. That is because the statute bars judicial review except in four circumstances: where the award was procured by corruption or fraud, where the arbitrators were partial or corrupt, where the arbitrators were guilty of misconduct, or where the arbitrators exceeded their powers. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (incorporating 9 U.S.C. § 10(a)(1)-(4)). If judicial review means judicial enforcement, then the statute is saying that a court may not enforce an IDR award *unless* it was obtained by fraud or corruption. That is obviously wrong. Hence, judicial review here must mean what it always means: a court's authority to *set aside* an improper ruling. So although the statute curtails judicial review, it is silent on the question here—a court's authority to *enforce* a ruling.

That said, although the statute does not explicitly bar judicial enforcement, [*11] it does not explicitly *provide for* judicial enforcement either. That omission itself may speak volumes. As the Fifth Circuit compellingly observes:

> Congress could have done otherwise. Section 9 of the [Federal Arbitration Act ("FAA")] empowers courts to confirm or enforce arbitration awards, *see* 9 U.S.C. § 9, but Congress chose not to incorporate § 9 into the NSA. It incorporated only parts of § 10. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). By contrast, in other statutes, Congress *has* incorporated § 9 to create a private right of action. *See* 5 U.S.C. § 580(c) ("A final award is binding on the parties to the arbitration proceeding, and may be enforced pursuant to sections 9 through 13 of" the FAA (emphasis added)). So, Congress knew how to create a private right of action in the NSA—and has done so elsewhere—but declined to do so.

*Guardian Flight Fifth Circuit, 140 F.4th at 276* (emphasis

in original).

The second prong of the debate—and this is where the issue of preemption surfaces—is whether the NSA provides its own enforcement mechanism. All sides agree on the basic framework: "the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 328, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015) (quoting Alexander v. Sandoval, 532 U.S. 275, 290, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)).

Under the NSA, the Department of Health and Human Services ("HHS") "is empowered to level civil penalties against insurers who violate their obligation to pay under the statute. [*12] HHS can fine insurers who fail to pay their IDR awards $100 every day for each failure to pay until compliance is rendered." *T.V. Seshan*, 2026 WL 867151, at *4 (citing 42 U.S.C. § 300gg22(b)(2)). Most courts have concluded that this authorization for HHS to levy penalties manifests Congress's "intent to preclude a private remedy." *Id.*; *accord Guardian Flight Fifth Circuit, 140 F.4th at 277* (citing § 300gg-22(b)(2) and concluding that Congress made a "policy choice to enforce the statute through administrative penalties, not a private right of action").

The court in the District of Maryland, however, argued that those penalties do not fill the role of enforcement: "Nothing in the No Surprises Act authorizes HHS (or DOL or Treasury or any state agency for that matter) to order a payor that is in violation of the Act to comply with an IDR determination." *PHI Health, 826 F. Supp. 3d at 667*. Hence, although a "comprehensive enforcement scheme" can "indicate the lack of a congressional intent to permit private rights of action[,]" here there is no such scheme because "HHS does not have any statutory authority to 'enforce' an IDR award[.]" *Id.* (internal citation omitted).

Apparently, the court there assumed that a statutory enforcement mechanism would be deemed preclusive only if it provides a remedy *to the aggrieved party*, as opposed to the fines [*13] authorized in the NSA, which go to the government.[3] That distinction is at odds with Supreme Court precedent. In *Armstrong*, the state of Idaho allegedly reimbursed certain healthcare providers at rates lower than permitted under the Medicaid Act, so the providers brought suit in federal court seeking to enjoin state officials to increase their rates. 575 U.S. at 323-24. After concluding that the relevant statute did not provide a private cause of action, the Court concluded that, by the same token, the plaintiffs also could not "invoke[e the Court's] equitable powers[ to] circumvent Congress's exclusion of private enforcement." Id. at 328. The Court found evidence of "Congress's intent to foreclose equitable relief" in the fact that "the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* (internal citations omitted).

On *PHI's*'s theory, that argument is a non-sequitur. Punishing the recalcitrant state does nothing to make the healthcare provider whole. Yet the Supreme Court held that "express provision of one method of enforcing a substantive rule suggests [*14] that Congress intended to preclude others." *Id.* (internal citation omitted).

Here too, by empowering HHS to level fines against insurers who refuse to pay IDR awards, Congress has indicated that other methods of enforcement are precluded. *See, e.g., Health Care Serv. Corp.*, 2026 WL 1802985, at *4 ("[B]y providing for alternative enforcement mechanisms, Congress chose agency enforcement as the tool for enforcing IDR awards, not litigation.").

Having concluded that the NSA does not provide a private right of action, the Court turns to whether the NSA precludes state law causes of action.

### *B. Whether the NSA Precludes Assertion of State-Law Causes of Action*

Federal preemption of state law is typically addressed under the Supremacy Clause, and it is a rich and well-established body of jurisprudence. That form of preemption is addressed below. *See infra* § I.B.2. Before reaching that question, however, the Court addresses a somewhat more niche form of preclusion which applies in the narrow circumstance presented here, namely, where a plaintiff attempts to use state law

---

[3] The other court in the private-cause-of-action camp, *Guardian Flight D. Conn.*, does not address § 300gg-22(b)(2) at all. *See* 789 F. Supp. 3d at 229 (addressing only 42 U.S.C. § 300gg-111(a)(2) and § 300gg-111(c)(4) and concluding that neither provides an enforcement mechanism).

as an end-run to enforce a federal statute that does not provide a private cause of action. *See* Astra USA, Inc. v. Santa Clara Cnty., Cal., 563 U.S. 110, 131 S. Ct. 1342, 179 L. Ed. 2d 457 (2011); *see also* Ortiz v. Ciox Health LLC, 21 F.4th 50, 52 (2d Cir. 2021). Doctrinally, these are distinct. Caselaw applying preemption under the Supremacy Clause does not [*15] tend to cite Astra, and Astra nowhere cites the Supremacy Clause.

1. Preclusion Assuming the NSA Does **Not** Provide a Private Cause of Action

If the NSA does not provide a private cause of action (as most courts hold), then it must also preclude Plaintiff's state-law claims. This conclusion follows directly from Supreme Court precedent. In Astra, the Court addressed a statutory regime under which drug manufacturers could opt in to Medicaid programs in exchange for signing a pricing agreement limiting what they could charge for drugs. 563 U.S. at 113. The agreements were "not transactional, bargained-for contracts[,]" but rather "uniform agreements that recite the responsibilities [the statute] impose[d.]" *Id.* Although the statute provided no private right of action, covered entities brought suit against overcharging manufacturers under a contract theory. *Id.* The Court rejected this attempted workaround, because the "contractual" obligations were "one and the same" with the statutory obligations. Id. at 118. The "form agreements, composed by HHS, contain[ed] no negotiable terms"; instead, they simply "serve[d] as the means by which drug manufacturers opt into the statutory scheme." *Id.* Suing to enforce the agreement must therefore fail, the [*16] Court held, because "[t]he absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if [covered] entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead." *Id.*; *see also* New York City Health & Hosps. Corp. v. WellCare of New York, Inc., 801 F. Supp. 2d 126, 138 (S.D.N.Y. 2011) (citing Astra and dismissing the plaintiff's breach of contract claim as an "impermissible end run" trying to enforce a federal law that did not provide for a private right of action).

That is the precise situation here. The Complaint describes Plaintiff's treatment of five patients covered by UHIC; for each, the Complaint alleges that the parties engaged in the IDR process, pursuant to which UHIC would have needed to "access the federal IDR portal and accept" certain terms and conditions. (ECF No. 1-1, ¶¶ 14-76.) The first four of Plaintiff's seven asserted causes of action—breach of express contract, breach of implied covenant of good faith, declaratory judgment, and account stated—are expressly rooted in the IDR agreement, and the latter three—quantum meruit, promissory estoppel, and unjust enrichment—implicitly arise therefrom as well. Based on Astra, a "contract" whose terms are dictated by the government is not a real contract, [*17] and its breach does not constitute a breach of contract. The Complaint is a transparent attempt to enforce the IDR award, which must fail, as "a plaintiff may not get around the lack of a private right of action under a federal statute by artfully pleading a third-party breach of contract claim or quasi-contract claim based on a violation of the statute." New York City Health, 801 F. Supp. 2d at 138. Because "no private right of action exists under the relevant statute, [Plaintiff's] efforts to bring [its] claims as state common-law claims are clearly an impermissible 'end run' around the" NSA. Grochowski v. Phoenix Const., 318 F.3d 80, 86 (2d Cir. 2003).

The District of Delaware's decision in SpecialtyCare is on point and persuasive. The plaintiff there brought suit seeking to "confirm" IDR awards under, *inter alia*, the Federal Arbitration Act ("FAA"); and also asserted state law causes of action for account stated, quantum meruit, and unjust enrichment. 2026 U.S. Dist. LEXIS 26722, 2026 WL 353259, at *2. After determining that the NSA itself provides no private cause of action, the court cited Astra for the proposition that the state law claims were likewise foreclosed:

> The gravamen of Plaintiffs' First Amended Complaint, and their sole theory of wrongdoing, is that Meritain has failed to pay $240,244 in IDR awards to Plaintiffs in violation of the NSA. Their state law [*18] claims are "one and the same" as their claims under the FAA . . . to enforce the IDR awards. Plaintiffs do not allege that Meritain violated any substantive obligation that arises independent of the NSA. Although account stated, quantum meruit, and unjust enrichment require proof of certain elements specific to those claims, the ultimate goal of the plaintiffs' claim here is to enforce the federal statute.

2026 U.S. Dist. LEXIS 26722, [WL] at *5 (citing Astra) (citation modified; internal citations omitted).

So too here, Plaintiff does not allege that UHIC violated any substantive obligation that arises independent of the NSA. Though Plaintiff attempts to artfully express its

theory in seven different causes of action, the ultimate goal of the Complaint is to enforce the federal statute. The Complaint is shot through with references to the NSA and IDR. While Plaintiff pretends that the IDR determinations "merely serve as evidence of the reasonable value of services rendered" (ECF No. 20 at 1), this lip service rings hollow. Where a complaint looks like a duck and quacks like a duck, courts cannot be expected to believe it is anything but a duck. *See* In re Adelphia Communications Corp., 376 B.R. 87, 98-99 (Bankr. S.D.N.Y. 2007) (citing Tidelands Marine Serv. v. Patterson, 719 F.2d 126, 128 n.3 (5th Cir. 1983)) ("That which looks like a duck, walks like a duck, and quacks like [*19] a duck will be treated as a duck even though some would insist upon calling it a chicken."); BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1337 n.28 (11th Cir. 1998) (same, and observing that, "The 'duck test' has received wide support from the courts").

Plaintiff relies principally on dicta[4] from two cases for the proposition that its "state law claims are entirely appropriate and not preempted by the NSA." (ECF No. 20 at 7.) Plaintiff's reliance on these cases, however, is misplaced. Indeed, a closer analysis of both cases brings into sharper focus just why Astra controls here.

First is Kennedy v. UnitedHealth Grp. Inc., No. 25 CIV. 432 (PAE), 2025 U.S. Dist. LEXIS 117870, 2025 WL 1725147 (S.D.N.Y. June 20, 2025). The court there stated that "United's depiction of the NSA—as supplanting state-law remedies for medical providers—is not anchored in any legal authority. . . . United has not identified any authority holding that the NSA bars medical providers from bringing state-law claims against the patient's insurer." 2025 U.S. Dist. LEXIS 117870, [WL] at *8. At first blush, that sounds exactly like Plaintiff's position. But that case is inapposite because the parties there never engaged in the IDR process. The healthcare provider sought reimbursement in state court under state-law theories. 2025 U.S. Dist. LEXIS 117870, [WL] at *2. United Healthcare attempted to remove to federal court under the theory that the complaint implicated certain federal laws, namely the [*20] Affordable Care Act and the Emergency Medical Treatment and Labor Act—but not the NSA. *Id.* It was in that context—where the parties had not submitted to IDR, and neither party asserted that the case implicated the NSA at all—that the court mentioned, in passing, that the NSA does not preclude state law remedies.

This distinction becomes more apparent when looking at the second case, Modern Orthopaedics, 2025 U.S. Dist. LEXIS 215824, 2025 WL 3063648. In arguing that the NSA provides a private cause of action, the plaintiff there made a policy-based argument: "'[t]he law states that Plaintiff . . . must instead avail itself of the NSA's IDR process and procedures to secure payment,' and it would therefore be left entirely helpless without judicial enforcement of the IDR." 2025 U.S. Dist. LEXIS 215824, [WL] at *11 (alterations in original). The District Judge rejected that argument, finding that the NSA "says nothing that would preclude a provider from bringing a suit under traditional state-law causes of action." *Id.* Plaintiff here seizes upon that language to show that the NSA does not preclude state-law claims. But cherry-picking lines devoid of context is no way to read a case. The court there was responding to the plaintiff's argument that denying a private right of action under the NSA [*21] would deprive providers of any method of recovery at all. To that the court responded: "The IDR is an opt-in process[.] [I]t provides an alternative, streamlined route to determine the amount owed between the parties—it does not displace traditional state-law remedies like unjust enrichment." 2025 U.S. Dist. LEXIS 215824, [WL] at *12.

Thus, according to *Modern Orthopaedics* the IDR is an "alternative," "opt-in process[.]" *Id. Kennedy* and *Modern Orthopaedics* stand only for the proposition that a provider who *doesn't* commit to IDR is free to pursue state-law remedies.[5] Nowhere does either of those cases state, or even suggest, that a provider who has already opted-in to IDR can then circumvent the IDR's lack of a cause of action by bringing state-law claims to obtain payment of the IDR award. *See* SpecialtyCare, 2026 U.S. Dist. LEXIS 26722, 2026 WL 353259, at *7 n.6 ("Critically, the plaintiff [in Kennedy] chose to bring

[4] At oral argument, Plaintiff's counsel conceded that even on Plaintiff's reading the cited passages are at most dicta, not holdings.

[5] At oral argument, counsel for both sides argued that the IDR process is mandatory from the beginning. However, both Kennedy and *Modern Orthopaedics* interpret the IDR process as optional. Also, the Court notes that Subsection (c)(1)(A) provides that either the provider or insurer "may" initiate open negotiations with the counterparty. 42 U.S.C. § 300gg-111(c)(1)(A). If the parties are unable to agree upon an amount within 30 days, subsection (c)(1)(B) provides that either party "may," during the next four days, initiate the IDR process. 42 U.S.C. § 300gg-111(c)(1)(B).

state law claims *rather than* seek redress under the IDR process or the NSA. . . . I do not read Kennedy and Mod. Orthopaedics as greenlighting Plaintiffs' state law claims.") (emphasis in original).

To summarize, the Court is persuaded that the NSA does not provide a private cause of action. If that is correct, then the NSA necessarily would prevent any state-law workarounds as well under the [*22] reasoning of the Supreme Court's decision in Astra. Kennedy and *Modern Orthopaedics*, properly understood, do not suggest a different conclusion.

However, that is all assuming the NSA does not provide a private cause of action. The Second Circuit—which, as explained above, is currently considering the matter—could yet come out the other way. In the event the Second Circuit finds that the NSA *does* provide a private cause of action, the question then becomes: does it preempt other causes of action such as those asserted by Plaintiff here?

2. Preemption Assuming the NSA **Does** Provide a Private Cause of Action

Pursuant to the Constitution's Supremacy Clause—which provides that federal law "shall be the supreme Law of the Land"—Congress has the power to preempt state law. Arizona v. United States, 567 U.S. 387, 399, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012) (citing U.S. Const. art. VI, cl. 2.) "Preemption may be either express or implied." New York City Health & Hosps. Corp. v. WellCare of New York, Inc., 801 F. Supp. 2d 126, 134-35 (S.D.N.Y. 2011) (citing Lorillard Tobacco Company v. Reilly, 533 U.S. 525, 541, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001)). "Express preemption arises when a federal statute expressly directs that state law be ousted." New York State Telecommunications Ass'n Inc. v. James, 101 F.4th 135, 147 n.9 (2d Cir. 2024) (quoting Air Transp. Ass'n of Am. v. Cuomo, 520 F.3d 218, 220 (2d Cir. 2008)) (citation modified). "[I]mplied preemption will bar a state law claim where, 'under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *In re Jackson, 972 F.3d 25, 34 (2d Cir. 2020)* (quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)). Courts have generally [*23] recognized two types of implied preemption: (1) "field preemption," "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," New York City Health, 801 F. Supp. 2d at 134-35 (citing Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992)); and (2) "conflict preemption," "whe[re] the state law 'actually conflicts with federal law,'" *Jackson, 972 F.3d at 34 n.4* (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990)). That said, field preemption and conflict preemption "are not 'rigidly distinct' and may overlap." *Jackson, 972 F.3d at 34 n.4* (quoting Crosby, 530 U.S. at 372 n.6).

"When addressing federal preemption questions, '[courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action,' and therefore 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Marentette v. Abbott Lab'ys, Inc., 886 F.3d 112, 117 (2d Cir. 2018)* (quoting first Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996) and then Wyeth v. Levine, 555 U.S. 555, 565, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009)).

As noted above, there are two overlapping types of implied preemption. First is field preemption. "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." Arizona, 567 U.S. at 401 (finding field preemption over alien registration, because "Federal law makes a single sovereign responsible for maintaining a comprehensive and [*24] unified system to keep track of aliens within the Nation's borders"); *see also, e.g.,* Freeman v. Burlington Broadcasters, Inc., 204 F.3d 311, 320 (2d Cir. 2000) (finding that the Federal Communications Commission's "broad authority to develop a comprehensive national regulatory system governing telecommunications" indicates that it "possess[es] exclusive authority over technical matters related to radio broadcasting[,]" leading to the conclusion that "federal law has preempted the field of RF interference regulation"). "The Supreme Court has noted that these are 'rare cases.'" James, 101 F.4th at 147 (quoting Kansas v. Garcia, 589 U.S. 191, 140 S. Ct. 791, 206 L. Ed. 2d 146 (2020)).

Second is conflict preemption. "Conflict preemption arises in two scenarios: (1) 'where it is impossible for a private party to comply with both state and federal requirements'; or (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Nat'l Shooting

Sports Found., Inc. v. James, 144 F.4th 98, 112 (2d Cir. 2025) (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995)). "The burden of establishing obstacle preemption, like that of impossibility preemption, is heavy: the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." James, 101 F.4th at 155 (quoting In re MTBE Prods. Liab. Litig., 725 F.3d 65, 101-02 (2d Cir. 2013)). "Federal law does not preempt state [*25] law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." Art & Antique Dealers League of Am., Inc. v. Seggos, 121 F.4th 423, 436 (2d Cir. 2024) (quoting *Marentette, 886 F.3d at 117*).

Here, neither form of preemption applies. Field preemption does not apply, as this is not one of those "rare" situations where Congress regulated an area so thoroughly as to evince an intent to crowd out other remedies. To the contrary, the NSA expressly provides that it "shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with individual or group health insurance coverage[.]" 42 U.S.C. § 300gg-23.[6] And conflict preemption does not apply, because state-law causes of action such as breach of contract do not pose any sort of obstacle to the fulfillment of Congressional intent. To the contrary, "state penalties could help to ensure that parties comply with the NSA's payment obligations and refrain from engaging in unfair practices to circumvent these provisions." Guardian Flight D. Conn., 789 F. Supp. 3d at 236. In sum, assuming the NSA itself provides a private cause of action, the purpose of the NSA would not be frustrated [*26] or undermined by allowing providers to vindicate that right through other means as well, such as breach of contract.

Accordingly, it is recommended that the Complaint be dismissed on the ground that NSA precludes assertion of state-law claims when the IDR process is pursued. However, in the event the District Judge disagrees with this recommended conclusion, the Court proceeds to analyze whether Plaintiff's state-law causes of action nevertheless state a claim.

## II. Whether Plaintiff has Stated a Claim

Defendant's notice of removal asserts subject-matter jurisdiction on the basis of diversity of citizenship. (ECF No. 1.) As such—and as both parties appear to concede—the substantive law to be applied is the law of the state in which the Court sits, namely, New York. Kimba Indus. Inc. v. Fortegra Specialty Ins. Co., No. 24-CV-01334 (JMW), 2026 U.S. Dist. LEXIS 45697, 2026 WL 618037, at *2 (E.D.N.Y. Mar. 5, 2026) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

### A. *Breach of Contract*

Plaintiff argues that the parties entered a contract when they elected to "access the federal IDR portal[,]" where they each independently accepted click-wrap terms and conditions of the IDR process by clicking "I agree" or "Accept" or the like. (ECF No. 1-1 at ¶ 22.) The parties needed to accept these "clear and conspicuous" terms in order to "submit an offer or lodge an objection [*27] to eligibility of the claim." (ECF No. 20 at 15.) In so doing, Defendant "affirmatively manifest[ed] its assent" to the terms of the IDR process, according to Plaintiff. (ECF No. 1-1 at ¶ 22.)

Plaintiff has failed to plead the existence of a contract. "To form a binding contract under New York law, it is often said that there must be a 'meeting of the minds.'" Wu v. Uber Tech., Inc., 43 N.Y.3d 288, 234 N.Y.S.3d 111, 260 N.E.3d 1060 (N.Y. 2024) (internal citations omitted). More precisely, "a binding contract requires an objective 'manifestation of mutual assent,' through either words or conduct, to the essential terms comprising the agreement." *Id.* (internal citations omitted). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.* (internal citations

[6] For the avoidance of doubt, § 300gg-23 does not undermine the Court's analysis above under *Astra*. That analysis still holds true: if there is no private cause of action under the NSA itself, there are no other causes of action either. But that is only true once someone has opted in to the IDR process; at that point, one may no longer use state-law remedies as a workaround to obtain the IDR award. If, however, one has not undergone IDR, then other remedies remain open pursuant to § 300gg-23. *See generally* SpecialtyCare, 2026 U.S. Dist. LEXIS 26722, 2026 WL 353259, at *7 n.6. 20

omitted).

It is true, as Plaintiff points out, that accepting click-wrap terms on a website is a legitimate means of manifesting assent. In Wu, for example, the New York Court of Appeals held that when an Uber passenger clicks "accept" on Uber's website, she commits herself to Uber's terms of use *vis-à-vis* Uber. *Id.* But no one would say that by agreeing to Uber's terms [*28] of service on Uber's website, the passenger somehow enters into a contract *with someone else*.

Here, the parties both accepted the terms of service to avail themselves of the IDR process. But as Plaintiff itself states, those terms were on a *federal* portal. (ECF No. 1-1 at ¶ 22.) At most, the parties each have independent rights and duties with the government. Plaintiff offers no argument as to how that would equate to a contract with each other.

The problem is especially glaring here in the context of an IDR award. "[T]here is a fundamental incompatibility between IDR, a unilateral right created by federal statute," and other rights "which stem[] from contract." *T.V. Seshan, M.D., P.C. v. Aetna, Inc.*, No. 25-CV-2938 (JGLC), 2026 WL 867151, at *5 (S.D.N.Y. Mar. 30, 2026). The court in *T.V. Seshan* contrasted arbitration, which is "about holding the parties to their prior agreement[,]" with IDR, which "is a unilateral right that either party may exercise under the appropriate conditions." *Id.* at *5. IDR is the antithesis of contract, as it "arises in the absence of any agreement between the parties, both in negotiations about the service at issue and in the prior step of lacking an in-network contract covering cost sharing more broadly." *Id.* Accordingly, Count One of the Complaint should be dismissed.

*[*29] B. Implied Covenant of Good Faith and Fair Dealing*

Under New York Law, there is an implied covenant of good faith and fair dealing attendant to all contracts. *Khan v. K1 Inv. Mgmt. LLC, 2:24-cv-07860 (JMW), 2025 U.S. Dist. LEXIS 125390, 2025 WL 1808725, at *10 (E.D.N.Y. July 1, 2025)* (citing Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977 (N.Y. 1995)) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance"); *see also* 511 West 232nd Owners Corp v. Jennifer Realty Co., 98 N.Y.2d 144, 773 N.E.2d 496, 500, 746 N.Y.S.2d 131 (N.Y. 2002). To state a claim for breach of this implied covenant, a plaintiff must plead that: (1) the defendant owes the plaintiff a duty to act in good faith and conduct fair dealing, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages. *Great Lakes Reinsurance (UK) SE v. Herzig, 413 F. Supp. 3d 177, 183 (S.D.N.Y. 2019)* (citation modified; internal citation omitted). "Broadly stated, the implied covenant 'embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Singh v. City of New York, 40 N.Y.3d 138, 195 N.Y.S.3d 429, 217 N.E.3d 1, 5 (N.Y. 2023)* (quoting Jennifer Realty Co., 773 N.E.2d at 500); *see also Burton v. Label, LLC, 344 F. Supp. 3d 680, 696 (S.D.N.Y. 2018)* (noting the implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included") (internal citation omitted).

Relevant here, "[t]here can be no breach of contract, or the implied covenant of good faith and fair dealing, without a governing valid contract." *Garrett v. Music Pub. Co. of Am., LLC, 740 F. Supp. 2d 457, 463 (S.D.N.Y. 2010)*. [*30] Accordingly, having established above that there was no contract here, Plaintiff's implied covenant claim should fail as well. *See, e.g., Kitchen Winners NY Inc. v. Rock Fintek LLC, 668 F. Supp. 3d 263, 288 (S.D.N.Y. 2023)* ("Because the duties imposed by the implied covenant of good faith and fair dealing arise as a result of the formation of a contractual relationship between the parties, a claim for breach of the implied covenant of good faith and fair dealing must be dismissed when there is no valid and enforceable contract between the parties.") (internal citation omitted); *Meyer v. New York-Presbyterian Hosp. Queens, 167 A.D.3d 996, 88 N.Y.S.3d 900, 901 (2d Dep't 2018)* ("[I]n the absence of a valid contract, dismissal of the cause of action to recover damages for breach of the implied covenant of good faith and fair dealing was warranted."). Count Two of the Complaint should therefore be dismissed.

*C. Declaratory Judgment*

The Declaratory Judgment Act ("DJA") provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201*. By saying the district court

"may" declare a party's rights—as opposed to "must"—the statute confers "'a broad grant of discretion to district courts to refuse to exercise jurisdiction over a [*31] declaratory action that they would otherwise be empowered to hear.'" *Admiral Ins. Co. v. Niagara Transformer Corp., 57 F.4th 85, 96 (2d Cir. 2023)* (quoting *Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003)*). The Second Circuit has articulated the following "non-exhaustive" list of factors for the district court to consider in exercising such discretion:

> 1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved;
>
> 2) whether such a judgment would finalize the controversy and offer relief from uncertainty;
>
> 3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata;
>
> 4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court;
>
> 5) whether there is a better or more effective remedy; and
>
> 6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins., 57 F.4th at 99-100* (citation modified; internal citations and quotation marks omitted).

"When considering the first two factors—whether the judgment will serve a useful purpose in clarifying or settling legal issues involved and offer relief from uncertainty—[courts have] declined to exercise jurisdiction over a declaratory judgment action that [*32] duplicates an available coercive action." *Myers Indus., Inc. v. Schoeller Arca Sys., Inc., 171 F. Supp. 3d 107, 122 (S.D.N.Y. 2016)*.

Here, Plaintiff seeks a declaration that "Defendant is obligated to pay the Awards as determined by the CIDREs in full and without delay." (ECF No. 1-1 ¶ 104.) "By refusing to pay the Awards despite repeated demands," Plaintiff alleges, "Defendant seemingly contends that it is not required to do so, or that payments may be delayed or avoided," when in fact "there is no appeal, complaint or administrative process that stays Defendant's payment obligations." (*Id.* at ¶¶ 101-102.)

In response, Defendant contends that "Jefferson's declaratory judgment claim is improper because it is duplicative of other causes of action and seeks no distinct or additional relief but merely repackages a nonviable enforcement theory." (ECF No. 18-1 at 21.) As Defendant explains, "[a] declaratory judgment claim is not available where it is merely duplicative of other causes of action and seeks no distinct or additional relief because where a plaintiff's substantive claims will necessarily determine the parties' rights, a declaratory judgment claim is redundant and should be dismissed." (*Id.*)

Defendant's statement of the law is correct. "Courts routinely reject declaratory [*33] judgment claims when other claims in the suit will resolve the same issues, as a declaratory judgment in such cases serves no useful purpose." *Cameron v. Winter, No. 25-CV-00210 (JAV), 2026 U.S. Dist. LEXIS 50446, 2026 WL 685959, at *5 (S.D.N.Y. Mar. 11, 2026)* (internal citation omitted); *see, e.g.*, *Jujamcyn Theaters LLC v. Fed. Ins. Co., 659 F. Supp. 3d 372, 383 (S.D.N.Y. 2023)* (dismissing declaratory judgment cause of action as "clearly duplicative" where it "would not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim") (internal citation omitted).

Defendant, however, misapplies that general principle to this case. The cases cited by Defendant involved successful breach of contract claims. *Ness Tech. S.A.R.L. v. Pactera Tech. Intl. Ltd., 173 A.D.3d 635, 105 N.Y.S.3d 412, 413 (1st Dep't 2019)* ("[S]ince plaintiff has a legal remedy for breach of contract, its cause of action for declaratory judgment should have been dismissed."); *Fleisher v. Phoenix Life Ins. Co., 858 F. Supp. 2d 290, 303 (S.D.N.Y. 2012)* ("[A]djudication of the breach of contract claim will address the issues of the validity of the COI Increases on which the claim for declaratory relief rests. Thus, any uncertainty regarding the legality of such actions will of necessity be relieved without the need for a declaratory judgment."). Here, by contrast, the Court found above that the parties never entered a contract.

Defendant further argues that:

> The Complaint makes clear what relief Jefferson seeks: a declaration [*34] that UHIC "is obligated to pay the Awards as determined by the CIDREs in full and without delay." (Compl. ¶ 104). That request does not arise from any independent New York law obligation. It simply asks the Court to declare that UHIC must do what Jefferson contends the NSA already requires. If Jefferson cannot bring a direct claim to enforce the IDR determination, it cannot obtain the same relief indirectly through a declaratory judgment.

(ECF No. 18-1 at 21.)

In framing the argument that way, Defendant reveals that the real basis for its argument against Plaintiff's declaratory judgment claim is not that it is duplicative of Plaintiff's *breach of contract* claim, but rather that it is duplicative of Plaintiff's entire theory under the NSA. For this exact reason, Defendant's argument must fail. The Court has already addressed above at length whether the NSA preempts Plaintiff's state-law claims. To review briefly, if the NSA does *not* provide a private cause of action (as most courts have held), then it precludes other causes of action pursuant to the Supreme Court's *Astra* decision. But if it does provide a private cause of action, then there is no reason to conclude it is preclusive. By hypothesis, [*35] Plaintiff could have brought a claim under the NSA but chose to bring this claim instead. Until the Second Circuit rules on whether the NSA provides a private cause of action, this remains an unsettled question.

At bottom, Defendant's argument here begs the question. The argument is predicated on the assumption that the NSA preempts this cause of action—but that is the very predicate that, by hypothesis, this argument was meant to set aside. (*See* ECF No. 18-1 at 2 ("Even if the Court were to consider the merits of Jefferson's state-law claims, those claims do not state any claims for relief as pled, as each cause of action fails to satisfy elements of those claims under New York law[.]").) As such, Plaintiff's declaratory judgment claim is not duplicative, so there would be no reason to dismiss it. *Cf. Myers, 171 F. Supp. 3d at 122* (dismissing complaint on all counts except declaratory judgment, because, *inter alia*, "no better or more effective remedy exists here"); *House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*, No. 13 CIV. 519 RJS, 2014 WL 1383703, at *12 (S.D.N.Y. Mar. 31, 2014) (dismissing breach of contract claim but sustaining related declaratory judgment claim where the latter "[could ]not be dismissed on the same grounds as" the former, because the questions presented were "independent").

Accordingly, Plaintiff's third [*36] cause of action should not be dismissed.

*D. Account Stated*

"To prevail on a claim for account stated, a plaintiff must establish the following elements: '(1) an account was presented; (2) it was accepted as correct; and (3) [the] debtor promised to pay the amount stated.'" *Yiwu Lizhisha Accessories Co. v. Jjamz, Inc., 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018)* (internal citation omitted), *report and recommendation adopted*, *No. 16-CV-6418 (JPO), 2019 U.S. Dist. LEXIS 110906, 2019 WL 2763841 (S.D.N.Y. July 2, 2019)*. "The second and third requirements (acceptance of the account as correct and a promise to pay the amount stated) may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.'" *Id.* (internal citation omitted). "An account stated assumes the existence of some indebtedness between the parties, or an express agreement to treat the statement as an account stated. It cannot be used to create liability where none otherwise exists." *TV Tech Managers, Inc. v. Cohen, 227 A.D.3d 838, 212 N.Y.S.3d 647, 651 (2d Dep't 2024)* (internal citation omitted).

"When an account is presented, 'the absence of an objection made within a reasonable time' may imply assent to the account and a promise to repay it." *Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-CV-2949 (PKC), 2018 WL 3636700, at *8 (E.D.N.Y. Feb. 24, 2018) (quoting *Interman Indus. Prods., Ltd. v. R.S.M. Electron Power, Inc., 37 N.Y.2d 151, 332 N.E.2d 859, 371 N.861, Y.S.2d 675 (N.Y. 1975)*); *see also, e.g., Morrison Cohen Singer & Weinstein, LLP v. Waters, 13 A.D.3d 51, 786 N.Y.S.2d 155 (1st Dep't 2004)* (holding "invoices were retained without [*37] any objection for a sufficient length of time as a matter of law to establish defendant's liability on the account stated cause of action"). However, "[t]o establish assent based on a defendant's non-objection, there must be some preexisting 'indebtedness owing between the parties or an express agreement between the parties to treat the statement as an account stated[.]'" *Design Partners*, 2018 WL 3636700, at *8 (quoting *Gurney, Becker & Bourne, Inc. v. Benderson Dev. Co., 47 N.Y.2d 995, 394 N.E.2d 282, 282, 420 N.Y.S.2d 212 (N.Y. 1979)*). To illustrate, the court in *Design Partners* found implied

assent under both methods: The parties had a pre-existing commercial relationship governed by purchase orders and a consulting agreement that established payment obligations; and the defendant expressly promised to make payment if the plaintiff reduced certain billable hours, which the plaintiff did. *See id.*

Here, Plaintiff argues that by receiving the IDR determination and failing to move to vacate it or otherwise seek recourse as provided by the NSA, Defendant manifested "implied agreement that the CIDREs' final determinations are correct." (ECF No. 1-1 ¶¶ 110-111.) This argument fails, because the Complaint pleads neither a "pre-existing indebtedness owing between the parties" nor "an express agreement between the parties to treat the statement [*38] as an account stated[.]" *Design Partners*, 2018 WL 3636700, at *8. Absent these factual predicates, Defendant's mere failure to challenge an arbitral award, without more, does not suffice to create an obligation under account stated. *Cf.* *SpecialtyCare, Inc. v. MedCost, LLC, No. 2025-0011-DH, 2026 Del. Ch. LEXIS 110, 2026 WL 432302, at *12 n.46 (Del. Ch. Feb. 16, 2026)* (addressing account stated claim under Delaware law, which is materially similar to New York law, and concluding: "I decline to hold that participation in an IDR proceeding constitutes adequate pleading of 'agreement' or 'acknowledgement' of a debt sufficient for an account stated claim.").

Indeed, by its very nature, the IDR process presupposes conflict, which is antithetical to assent. By way of analogy, the Second Department in *TM 18 Realty, LLC v. Copper Wang, Inc.* held that defendants' "failure to object could not be construed as assent to the correctness of the account" where the plaintiffs sent a statement of account after the defendants had accused the plaintiffs of failing to uphold their end of the bargain. *222 A.D.3d 904, 202 N.Y.S.3d 267, 269 (2d Dep't 2023)*. So too here, United Health has disputed Plaintiff's claims from the beginning. As such, its purported failure to object to the IDR determination (if it even did fail to object) cannot be construed as assent.

Accordingly, Count Four should be dismissed.

### *E. Promissory Estoppel [*39]*

"In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995)* (internal citation omitted); *accord* *Sabre Intl. Sec., Ltd. v. Vulcan Cap. Mgt., Inc., 95 A.D.3d 434, 944 N.Y.S.2d 36 (1st Dep't 2012)*.

Here, Plaintiff's claim for promissory estoppel fails on each element, because the Complaint provides only "threadbare recitals of [the] cause of action's elements." *Iqbal, 556 U.S. at 663*. With respect to a "clear and unambiguous promise," Plaintiff alleges that "Defendant promised, through its participation in the NSA's IDR process, to be bound by the CIDREs' final determinations and to pay the Awards as determined by the CIDREs"; specifically by "furnish[ing] EOBs to Plaintiff communicating that the claim in question is subject to the rules and procedures of the NSA." (ECF No. 1-1 ¶¶ 124-125.) Plaintiff does not explain how "communicating that the claim in question is subject to the rules and procedures of the NSA" equates to a clear and unambiguous promise "to be bound by the CIDREs' final determinations and to pay the Awards as determined by the CIDREs." To the contrary, communicating that the claim in question [*40] is subject to the rules and procedures of the NSA is merely "descriptive," which the New York Court of Appeals has held to *not* constitute a clear and unambiguous promise. *Bentkowski v. City of New York, 44 N.Y.3d 611, 250 N.Y.S.3d 408, 275 N.E.3d 597 (N.Y. 2025)* ("[T]he language in the SPDs is descriptive and for informational purposes only. The language on which petitioners rely—'becomes eligible,' 'is provided,' 'provides,' and 'supplements'—is in the present tense.").

With respect to the second element, "a reasonable and foreseeable reliance by the party to whom the promise is made," the Complaint is even more conclusory. It merely states that "Defendant reasonably expected Plaintiff to rely on that promise as the EOBs convey to Plaintiff that it can seek additional reimbursement via the NSA." (ECF No. 1-1 ¶¶ 126.) Likewise, with respect to Plaintiff's reliance, the Complaint states, "Plaintiff relied on Defendant's promise by participating in the NSA's IDR process and foregoing other remedies to recover payment for the medical services Plaintiff rendered to Defendant's members." (*Id.* at ¶ 127.) Plaintiff does not elaborate on what other remedies it might have pursued in lieu of Defendant stringing it along with false promises of honoring the IDR process.

Finally, with [*41] respect to the third element, "an injury

sustained by the party asserting the estoppel by reason of the reliance," Plaintiff asserts that it "suffered damages as a result of Defendant's failure to honor its promise to pay the Awards as determined by the CIDREs." (*Id.* at ¶ 129.) This does not explain how Plaintiff was injured "by reason of [its] reliance"; rather, Plaintiff was injured by not being paid for the medical services it rendered.

In its opposition brief, Plaintiff does not elaborate or cite a single case to support its theory of promissory estoppel. (*See* ECF No. 20 at 17-18.)

Accordingly, because Plaintiff has provided nothing but conclusory, threadbare recitals of the elements of promissory estoppel, Count Six should be dismissed. *In re Vasu, 129 F. Supp. 2d 113, 121 (D. Conn. 2001)* (dismissing New York promissory estoppel claim where complaint was "conclusory").

*F. Quantum Meruit and Unjust Enrichment*

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 54 (2d Cir. 2011)* (citation omitted). Quantum meruit and unjust enrichment claims are analyzed together as a single quasi contract claim. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005)*. To state a claim for unjust enrichment under New York law, a plaintiff [*42] must show that "(1) the defendant was enriched; (2) at the plaintiff's expense; and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Ainbinder v. Money Ctr. Fin. Grp., Inc., No. CV 10-5270(SJF)(AKT), 2013 U.S. Dist. LEXIS 47103, 2013 WL 1335997, at *8 (E.D.N.Y. Feb. 28, 2013)*, *report and recommendation adopted by* *No. 10-CV-5270 (SJF)(AKT), 2013 U.S. Dist. LEXIS 45501, 2013 WL 1335893 (E.D.N.Y. Mar. 25, 2013)* (citation omitted). To state a claim for quantum meruit under New York law, a claimant must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005)*.

Plaintiff's theory of unjust enrichment fails on the very first element, as Defendant was not enriched. "[C]ourts have repeatedly held that providers cannot bring unjust enrichment claims against insurance companies based on the services rendered to the insureds." *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Ins. Co., No. 23-CV-3632-SJB-LKE, 2025 U.S. Dist. LEXIS 134663, 2025 WL 1940325, at *9 (E.D.N.Y. July 15, 2025)* (quoting *Abira Med. Labs., LLC v. Cigna Health & Life Ins. Co., No. 24-2837-CV, 2025 U.S. App. LEXIS 12183, 2025 WL 1443016, at *2 (2d Cir. May 20, 2025)*); *see also, e.g.,* *Da Silva Plastic & Reconstructive Surgery, P.C. v. UnitedHealthcare Ins. Co. of New York, Inc., 234 A.D.3d 926, 226 N.Y.S.3d 294, 296 (2d Dep't 2025)* ("The cause of action alleging unjust enrichment was subject to dismissal because the medical services at issue were rendered at the behest of the subject members.").

By the same token, Plaintiff's quantum meruit claim must fail as well. "It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance [*43] company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured—which hardly can be called a benefit." *Travelers Indem. Co. of Connecticut v. Losco Grp., Inc., 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001)* (concluding plaintiff could not state a claim under quantum meruit); *see also, e.g.,* *Laine v. Empire HealthChoice Assurance, Inc., 234 A.D.3d 833, 226 N.Y.S.3d 258, 261 (2d Dep't 2025)* ("Here, as the complaint alleges that chiropractic services were performed by the plaintiff at the behest of his patients, no claim in quantum meruit can be asserted against the defendant."). Accordingly, Counts Five and Seven should be dismissed.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendant's Motion to Dismiss Plaintiff's Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* (ECF No. 18) be **GRANTED**, because application of the NSA precludes assertion of the statelaw claims. In the alternative, if the District Judge concludes that the NSA does not bar Plaintiff's state-law claims, then it is respectfully recommended that all be dismissed except for Count Three, namely, Declaratory Judgment.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of [*44] this Report. *28 U.S.C. § 636(b)(1) (2006 & Supp. 2011)*; *Fed. R. Civ. P. 6(a)*, *72(b)*. Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn, 474 U.S. 140, 145, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)* ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008)* ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); see *Monroe v. Hyundai of Manhattan & Westchester, 372 F. App'x 147, 147-48 (2d Cir. 2010)* (summary order) (same).

Dated: Central Islip, New York

September 17, 2026

**RESPECTFULLY RECOMMENDED**,

/s/ James M. Wicks

JAMES M. WICKS

United States Magistrate Judge

---

End of Document